## GEORGE WRIGHT YOUNG

### *v.*

## JOHN V. FARWELL *et al.*

### *Filed at Ottawa June 19, 1893.*

1.  CONTRACTS—*courts will not make them, but enforce—meeting of minds.*  Courts will not enforce a contract when its terms are left in such doubt and uncertainty that it is impossible to say, from the evidence, that the minds of the parties ever met upon anything definite. It is the duty of the courts to enforce contracts made by the parties when the terms and conditions of the contract are established by evidence, but courts can not make contracts for parties and then enforce them.

2.  SAME—*burden of proof.*  The burden of proof lies upon a party seeking the enforcement of a contract, to establish the terms and conditions of the same as alleged by him.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. O. H. HORTON, Judge, presiding.

Mr. A. D. CURRIER, for the appellant:

In the construction of contracts it is the duty of courts to seek to ascertain the intention of the parties, and to give effect thereto.   *Kuecken* v. *Voltz,* 110 Ill. 265; *Lintner* v. *Milliken,* 47 id. 181; *Burgess* v. *Badger,* 124 id. 293; *Massie* v. *Belford,* 68 id. 290; *Walker* v. *Tucker,* 70 id. 527; *Field* v. *Leiter,* 118 id. 27; *Leavers* v. *Cleary,* 75 id. 349; *Insurance Co.* v. *Alcott,* 97 id. 440.

Words used in a contract are taken in their popular sense, and are construed according to their plain, natural and obvious meaning, unless the whole evidence shows a contrary intent.   *Stearns* v. *Sweet,* 78 Ill. 446; *Stettauer* v. *Hamlin,* 97 id. 312; *Supreme Council* v. *Curd,* 111 id. 288.

A contract is to be supported rather than defeated.   *Holmes* v. *Bemis,* 124 Ill. 454; *Easton* v. *Mitchell,* 21 Bradw. 189.

Contracts are construed according to their strict and primary acceptance. *Kirby* v. *Railway Co.* 109 Ill. 412; *Wells* v. *Carpenter*, 65 id. 450.

Words used in a contract are construed most strongly against the party making the proposition. *Kirby* v. *Railway Co.* 109 Ill. 412; *McCarty* v. *Howell*, 24 id. 341; *Massie* v. *Belford*, 68 id. 290; *County of Clinton* v. *Ramsay*, 20 Bradw. 577.

Such construction as would render a contract inoperative or meaningless should be avoided. *Field* v. *Leiter*, 118 Ill. 27; *Holmes* v. *Bemis*, 124 id. 454.

Messrs. FLOWER, SMITH & MUSGRAVE, for the appellees:

That the intention of the parties must control, is the only fundamental and inviolable rule for the determination of the law which shall govern the construction of the contract. Every other rule upon this subject is subordinate to this one, and may be disregarded when in conflict with it. Jones on Construction of Contracts, 31; *Royal Templars* v. *Curd*, 111 Ill. 284; *Robinson* v. *Stowe*, 39 id. 568; *Walker* v. *Douglas*, 70 id. 445; *Field* v. *Leiter*, 118 id. 17; *Colton* v. *Field, Leiter & Co.* 131 id. 404.

That intention is to be ascertained by reference to the instrument as a whole, viewed in the light of the surrounding circumstances, and effect is to be given to the intention, though violence be done thereby to its words. *Walker* v. *Douglas*, 70 Ill. 448; *Field* v. *Leiter*, 118 id. 26; *Railroad Co.* v. *Bartlett*, 120 id. 603.

Where the terms of a contract are in any respect doubtful or uncertain, the construction placed on the contract by the parties themselves, if reasonable, must govern. *Burgess* v. *Badger*, 124 Ill. 296; *People* v. *Murphy*, 119 id. 159; *Leavers* v. *Cleary*, 75 id. 349.

Courts do not make contracts for parties. Where it appears that the language used or terms proposed are understood dif-

ferently by the parties, there is no meeting of minds, and hence no contract. Pollock on Contracts, 412; *Brandt* v. *Gallup,* 5 Bradw. 262; *Hogue* v. *Mackey,* 24 Pac. (Kan.) 477; *Nims* v. *Vaughn,* 40 Mich. 356; *Wagner* v. *Egleston,* 49 id. 218.

Courts will not enforce contracts which, after applying the helps which the rules of interpretation afford, are still indefinite and uncertain. Bishop on Contracts, sec. 316, and citations; *Dunkart* v. *Reinhart,* 89 N. C. 354; *Blakeley* v. *Patrick,* 67 id. 40; *Krauskop* v. *Shontz,* 51 Wis. 204.

Mr. Justice Craig delivered the opinion of the Court:

This was a bill brought by George Wright Young, against John V. Farwell & Co., the appellees herein, for an accounting under an alleged verbal contract, by which it is claimed he was to act as manager of the department of silks and velvets in appellees' wholesale establishment in the city of Chicago for a period of six months, from July 1, 1889, to January 1, 1890, for a fixed salary, and in addition thereto, under certain conditions, an interest in the profits of the department in which he was employed.

At the time of making the alleged contract the appellees were conducting a large wholesale dry goods house in Chicago. The house was divided into floors and departments, with distinct heads and sub-heads, but the entire business was under one general management. The complainant, Young, had been in the employment of appellees for a number of years, and for some time prior to the making of the alleged contract he had been sub-head of the department of dress goods, silks and velvets, W. C. Rice being at the head of the department. During the year 1888 he received a salary of $2250. A few days before the close of the year 1888 he was notified by John V. Farwell, Jr., who was manager and employed all the hands on certain floors, that for the year 1889 his salary would be reduced to $2000, and he was employed for that sum. In the

month of May, 1889, Rice resigned his position as manager of the department of dress goods, silks and velvets, and in the month of June, Farwell and Young had an interview in regard to the employment of Young from July 1 to January 1, to take the position made vacant by the resignation of Rice. At this interview a verbal contract was made, but no person was present to witness the contract, and no one knew what the contract was but the two' contracting parties. It appears from the evidence of both Young and Farwell, that Young insisted upon an increase in his salary. He testified that he insisted on $4000, while Farwell says the amount insisted on was $3000. Farwell, however, refused to increase the fixed salary beyond $2250 a year, and it was finally agreed that the fixed salary should be $2250 per annum for the six months. In addition to this amount it was understood by the parties that Young should have an additional sum from the profits realized from the department which he was employed to manage, but the parties do not agree as to the terms of this part of the contract, and from the evidence of the two parties there is much doubt and uncertainty in regard to what the real contract was. Indeed, the statements made by complainant himself in reference to the terms of the contract are not harmonious. In his letter of February 21, 1890, he wrote appellees as follows : "I wish to recall, and for your consideration, the verbal contract with the writer, of last June. As a compromise for your not doing more than reinstating the amount of salary of previous two years, you offered to divide if I did well and the profits were good under my management." On July 5 he again writes as follows: "You recollect he (I) resigned June 21, 1889, because of a difference of $1750 increased salary asked for, and other good reasons; then you offered as a compromise, in lieu of the $1750, to *divide* with him (me) the surplus above past percentages made." The complainant, in his bill, alleged he was to have an interest in the profits, "which interest it was agreed should be an equal

division between orator and J. V. Farwell & Co. of all the profits that should accrue over and above the past average of profits in the business of the department of silks and velvets under the management of orator." In his deposition taken September 1, 1891, complainant testified to the contract as follows : "Farwell said, 'I will do this with you : we will divide with you all the profits made over the past percentage.' I knew the best I had ever done was eight to twelve per cent, but more frequently from ten to eleven per cent profit. Therefore I accepted his terms, and he immediately arranged for me to go to New York to buy and sort up goods that very next day." Upon a subsequent examination the complainant, in detailing the terms of the contract, testified as follows : "Farwell said, 'I will divide with you all the profits that your department makes over your past average percentage of profits.'" As to the average percentage of profits the complainant testified : "They varied from eight to twelve per cent. It was always according to the elements and the crops, which made the good or the bad seasons."

It will be observed that there is a radical difference between the different statements of the complainant in regard to what the contract was. Which one of the statements shall be adopted as the contract? Shall we adopt the statement contained in his letter of February 21 ? If so, then there was to be a division if complainant did well and the profits were good under his management. Or shall we accept complainant's statement of July 5 ? If so, then there was to be a division of the surplus above past percentages. Or shall we take the evidence of complainant on his second examination ? If so, then there was to be a division of profits made in the department over the past average percentage of profits made by complainant. There is as much reason for adopting one of these statements as the other, and in arriving at a conclusion in regard to what the contract was, the question is left in so much doubt and uncertainty that a court can not rea-

sonably determine, from the contradictory statements, what the contract really was.

But the terms of the alleged contract are rendered more uncertain when the evidence of Farwell, the other contracting party, is considered. He denies that he agreed to give any definite share of the profits, but says that the salary for the six months was fixed on the basis of $2250 a year,—$1125 for the six months,—and in addition he agreed with complainant; if he did well they would give him a bonus; and in his letter to complainant of February 25, 1890, he says: "By my remarks to you on the 21st of last June I meant that if the department did only what ought to be done by any good manager, you would not receive any additional compensation, but that if it made more than its regular percentage I was willing 'to divide,' not in two equal parts, the extra amount, but to give you part of it. You made about $2500 over your percentage, and I am willing to give you ten per cent of it, or $250."

We are satisfied from the evidence, after giving due weight to all of it, that appellees agreed to give appellant something in addition to his salary of $2250 per annum, but what amount was to be paid, or under what terms and conditions complainant was to receive any sum over and above his fixed salary, is left in such doubt and uncertainty that it is impossible to say, from the evidence in this record, that the minds of the parties ever met upon any definite proposition, and if the minds of the parties never met upon some definite proposition, under which the complainant was to receive a part of the profits, we do not understand upon what principle he can maintain a bill for an accounting. It is the plain duty of courts to enforce contracts made by parties when the terms and conditions of the contract are established by evidence, but courts can not make contracts for parties and then enforce such contracts. Here it devolved upon complainant to allege

in his bill a contract, and establish that contract by evidence. This he has failed to do.

We think the decree of the circuit court was correct, and the judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*